**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | | |
|---|---|---|
| **SHAYLA HOOKS and** | ) | |
| **TYRONE JACKSON,** | ) | |
| | ) | |
| **Plaintiffs/Counterclaim-Defendants,** | ) | |
| | ) | **Civil Action No. 4:21-CV-00841-KGB** |
| **v.** | ) | |
| | ) | |
| **SALTGRASS ARKANSAS INC., d/b/a** | ) | **District Judge Baker** |
| **SALTGRASS STEAKHOUSE,** | ) | |
| | ) | |
| **Defendant/Counterclaim-Plaintiff.** | ) | |

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF'S CLAIMS AND DEFENDANTS' COUNTERCLAIMS</u>

Defendant SALTGRASS Arkansas Inc., d/b/a SALTGRASS Steakhouse ("Defendant," the "Restaurant," the "Company," or "SALTGRASS") hereby submits the following Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiffs' Claims and Defendant's Counterclaims, pursuant to Local Civil Rule 7.2(a) and 56.1 and Federal Rule of Civil Procedure 56(a), seeking an award of damages, including interest, attorneys' fees and costs, and any other relief this Court deems just and proper.

### I.    INTRODUCTION

On June 27, 2020, Plaintiffs Shayla Hooks and Tyrome Jackson[1] (collectively, the "Plaintiffs") initiated a physical brawl with another group of customers (the "Group") at SALTGRASS Steakhouse in Little Rock, Arkansas.  *See* Ex. A, Little Rock Police Department Incidence Report.  Yet, now, the Plaintiffs have filed the instant suit against SALTGRASS

---

[1] Named Plaintiff Tyrone Jackson identified himself as Tyrome Jackson during his deposition. *See* Exhibit F at 7:7-8.

claiming that SALTGRASS was negligent by failing to enforce Arkansas's Phase II COVID protocols and for failing to remove the Group from the premises after members of the Group became aggressive, unruly, and loud. *See generally* Compl. Plaintiffs, who are African American, also assert a claim of Section 1981 race discrimination, alleging that they were treated differently than the Group, that appeared to consist of Caucasian persons. *See id.*

As detailed below, however, Plaintiffs fail to produce any evidence that SALTGRASS racially discriminated against the Plaintiffs, or breached any duty owed to the Plaintiffs. *See infra.* In fact, Plaintiffs concede that they were preferred customers at the Restaurant. *See* (". . . we patronize that restaurant several, several times. . ."), Ex. F, Tyrome Jackson Dep. ("Jackson Dep.") at 107:8-9. Plaintiffs also concede that SALTGRASS management treated them fairly, and did not discriminate against them in any manner. *See* ("Q: On that day of that incident, you and Ms. Hooks came to the restaurant to eat, didn't you? A: Yes. . . . Q: Y'all had been treated fairly when you were there before? A: Yes. Q: That's why you came back. Right? A: True. . . . Q: On that particular day, y'all came and they served you by sitting you in an area away from everybody else. Right? . . . A: Yes. Q: And you were comfortable where they seated you? A: Yes."), Ex. F, Jackson Dep. at 47:20-49:2. Accordingly, SALTGRASS requests that the Court grant SALTGRASS summary judgment on Plaintiff's race discrimination and negligence claims.

Additionally, SALTGRASS filed three counterclaims—nuisance, trespass, and tortious interference with business relationships—against the Plaintiffs based on the Plaintiffs disruptive conduct. *See* Doc. 3, the SALTGRASS Answer. SALTGRASS now moves for summary judgment on two of its counterclaims: trespass and tortious interference with business relationships. *See infra.* During their visit to the SALTGRASS Restaurant on June 27, 2020, Plaintiffs' invitee status transformed to trespasser status when SALTGRASS Manager Ron

McGranahan requested that the Plaintiffs stop engaging in a verbal altercation, and leave the Restaurant.  *See infra.*  Moreover, Plaintiffs engaged in a verbal altercation that turned physical causing SALTGRASS' customers to leave the restaurant without paying.  *See id.*  Accordingly, SALTGRASS requests that the Court grant summary judgment in favor of the Restaurant on SALTGRASS's counterclaims.

## II.   STATEMENT OF FACTS

### A.  Plaintiffs Enter the COVID-Compliant SALTGRASS Restaurant and Are Seated in Accordance with COVID Protocols.

During the COVID-19 pandemic, on June 27, 2020, the SALTGRASS Restaurant in Little Rock, Arkansas, was observing proper COVID protocols when the Plaintiffs visited the Restaurant and requested dine-in service.  *See* Ex. B, COVID-19 Signage in the SALTGRASS Restaurant; *see also* Ex. C, Plaintiff Hooks' GoFundMe ("the manager . . . told us those seats were blocked off due to Covid-19"); ("Q:  And she did that because they wanted you to social distance?  A:  Yes.  Q:  And they instructed you to social distance?  A:  Yes."), Ex. E, Shayla Hooks Dep. ("Hooks Dep.") at 27:10-14.  The Plaintiffs were seated at the end of the bar away from other customers.  *See id.*

After entering the Restaurant and being seated, Plaintiffs removed the protective face masks they wore upon the entering the Restaurant.  *See* ("A:  We have to have it coming in and once you're sitting down and drinking and everything, kind of took it off.  Q:  During the course of the altercation, you didn't have your mask on, did you?  A:  No."), Ex. F, Jackson Dep. at 88:2-7.

At some point, Plaintiffs ordered food.  *See* ("Q:  So Ms. Hooks was going back and forth with the lady and you were trying to eat?  A:  Well, our food had came and I want to say I took a bite of my salad probably, I think."), Ex. F, Jackson Dep. at 136:19-22; *see also* ("He said

yesterday that he had a salad, but - - He had a salad but our food hadn't made it out yet."), Ex. E, Hooks Dep. at 52:18-20; ("No, we had ordered our food and we really thought we were getting ready to eat."), Ex. E, Hooks Dep. at 135:8-9.

### B.  The Verbal Argument Between the Plaintiffs and the Group Begins.

Shortly after Plaintiffs were seated at the bar, a group of Caucasian persons from Louisiana (the "Group") entered the Restaurant, approached Plaintiffs and asked to sit beside them.  *See* ("Q: Yeah. They asked, do you mind if I sit next to you.  Right?  A:  Oh, yes.  Yeah.  Q:  And you said no?  A:  Yes."), Jackson Dep. at 49:7-11.  According to Hooks, the man initially asked to sit next to her and Jackson at the bar in a space that was marked as reserved in order to facilitate social distancing.  *See* ("And that's when he turned to Ty and said, Hey, bud, can I sit right here?  And Ty said, It's COVID, I don't feel too comfortable - - or I think he said, No."), Ex. E, Hooks Dep. at 28:6-9.  Jackson said no.  *See* ("Q:  And you said no?  A:  Yes."), Ex. F, Jackson Dep. at 49:7-11; *see also* (". . . And Ty said, . . . or I think he said, No.  And then, the guy hit the table and cursed."), Hooks Dep. at 28:7-9; *see also* (". . . And they just stood around behind us and was just talking about COVID and how stupid people were about COVID. . ."), Ex. E, Hooks Dep. at 30:11-25.  Specifically, Jackson informed the man that they were observing social distancing and the gentleman could not sit next to them.  *See* Ex. G, McGranahan Declaration; *see also* ("Q:  The question was directed at you?  A:  Yes.  Q:  And the guy called you a stupid whatever?  A:  Yes."), Ex. F, Jackson Dep. at 130:14-17.

### C.  Hooks Notifies Management of the Group's Comments.

While seated at the bar, Hooks flagged down Senior Associate Manager Ron McGranahan ("Manager McGranahan") and told Manager McGranahan that a man from the Group, whom she described as bald, had called her "fucking stupid."  *See* Ex. G, Ron McGranahan Declaration

("McGranahan Declaration").  Jackson admitted that the words "fucking stupid" are unrelated to race.  *See* ("Q:  Does the words, how fucking stupid people are about Covid, have anything do with your race?  A:  No.  Q:  People can be stupid whether they're black or white, green or purple. Right?  A:  Yes.  Q:  Has nothing to do with race, does it?  A:  No.  And a lot of people have different opinions about Covid.  Right?  I guess, yeah."), Ex. F, Jackson Dep. at 131:10-20.

Hooks gave Manager McGranahan a description of the man and where she believed the man was located, and Manager McGranahan set out to find him.  *See* Ex. G, McGranahan Declaration; *see also* ("Okay. Did you ever see a manager leave to find the individual that had said inappropriate things to you guys?  Yes, I did."), Ex. F, Jackson Dep. at 130:23-131:2.  Manager McGranahan could not locate the man.  *See* Ex. G, McGranahan Declaration.  Manager McGranahan informed Hooks that he could not find the man, but that the Restaurant was getting ready to seat the Group so that the Group would not have to order anything from the bar.  *See* Ex. G, McGranahan Declaration.  Manager McGranahan then returned to the hostess stand to help identify tables for the Group to be seated in accordance with social distancing, and returned to the kitchen.  *See* Ex. G, McGranahan Declaration.

**D.  A Man From the Group Allegedly Coughs on Plaintiffs.**

Thereafter, Hooks claims that a man from the Group coughed at her.  *See* (". . . And then, the guy came in and he coughed on - - he coughed on us.  Like, he coughed in my direction, but Ty wasn't looking. . . . I just instantly stood up and went to the bathroom to wipe off my neck and the side of my face because he like - - I felt the spit on my face."), Ex. E, Hooks Dep. at 32:23-33:4.  In response, Hooks got up and went to the bathroom and claims that four women from the Group followed her into the bathroom where they exchanged words both inside and outside of the bathroom.  *See* ("Q:  . . . So you are washing your hands, they ask you the question, Who do you

think you are?  A:  Uh-huh  Q:  And you sort of back out of the - -  A:  Uh-huh.  Q:  - - out of the restroom?  A:  Uh-huh.  Q:  Then what did you do when you did that?  A:  I may have said something to them because I know when I got out of the bathroom that's when Melody's husband or boyfriend or whoever the flag shirt, he said across the room, You fucking black bitch, across the room."), Ex. E, Hooks Dep. at 41:4-17.  After leaving the restroom, Hooks also began to exchange words with a man from the Group after he called her a "black bitch."  *See* ("Q:  Okay. So you're walking from the restroom back toward where you had been seated before at the end of the bar close to the hostess stand?  A:  Uh-huh, right.  Q:  And you heard him say 'black bitch'? . . . A:  You fucking black bitch.  Q:  Okay.  And then what did you do?  Did you go sit down?  A:  I instantly started talking back to him."), Ex. E, Hooks Dep. at 44:13-23.  Hooks in turn, responded by stating, "No, your wife's the bitch."  Ex. E, Hooks Dep. at 44:3-6.

Once Hooks returned to her seat at the bar, she contends that Group members came up to Plaintiffs and started touching Plaintiffs.  *See* ("Q:  And did he say anything else to you other than calling you a black bitch?  A:  They instantly stood up and came and started touching us."), Ex. E, Hooks Dep. at 45:12:15; ("Q:  These individuals called you the N-word?  A:  Uh-huh."), Ex. E, Hooks Dep. at 111:12-14.

### E.  Plaintiffs' and the Group's Argument Continues.

Shortly thereafter, a SALTGRASS employee informed Manager McGranahan that the argument at the bar was growing in intensity.  *See* Ex. G, McGranahan Declaration.  Apparently, Hooks became engaged in a loud, expletive-riddled argument with the Group.  *See* Ex. H, Police Transcript of Calls, at 000029; *see also* (". . . I instantly started talking back to him . . . I was saying rude things back to him . . ."), Ex. E, Hooks Dep. at 44:21-45:11; ("They being Ms. Hooks and her were - - Yes.  - - yelling at each other?  Yes."), Ex. F, Jackson Dep. at 138:4-6.  Specifically, Hooks

shouted that a man from the Group had spat and coughed on her.  *See* Ex. E, Hooks Dep. at 36:1-5.

Plaintiffs used profanity during the argument.   *See* ("I instantly started talking back to him. What did you say to him? . . . I was saying rude things back to him . . . I think I may have said, No your wife's the bitch. . . . it was a match back-and-forth after that."), Ex. E, Hooks Dep. at 44:23-45:11; *see also* Ex. I, Video of Fight.

Manager McGranahan attempted to deescalate the situation and asked the parties to stop arguing.  *See* Ex. G, McGranahan Declaration; *see also* Ex. H, Police Transcript of Calls, at 000029 ("It's a female.  The male's not doing anything. . . they're yelling at the patrons.  They're yelling at the manager.").  Both Plaintiffs and the Group blatantly ignored Manager McGranahan's pleas and continued to escalate the altercation.  *See* Ex. G, McGranahan Declaration.  As the argument continued, Manager McGranahan told members of the Group that they needed to leave the restaurant.  *See* Ex. G, McGranahan Declaration.  Manager McGranahan also specifically requested that Plaintiffs leave.  *See* ("Q:  And they - - did someone ask you to leave the restaurant?  A:  I can't really remember.  I don't think they did but might have."), Ex. F, Jackson Dep. at 63:25-64:3; *see also* Ex. G, McGranahan Declaration.  Plaintiffs refused.  *See also* Ex. G, McGranahan Declaration.

When the shouting increased and the parties ignored pleas to stop, Manager McGranahan called 911 and asked for the police to come to the Restaurant and assist in escorting Plaintiffs and the Group from the Restaurant.  *See*  Ex. H, Police Transcript of Calls, at 000028-29; *see also* Ex. G, McGranahan Declaration; ("Q:  . . . sometime during the course of that altercation that call was made, right?  A:  . . . Yeah, I guess."), Ex. E, Hooks Dep. at 115:3-7; ("Q:  Based upon this record, you have no reason to dispute that Saltgrass did call the police, do you?  A:  No."), Ex. E, Hooks

Dep. at 115:25-116:1.  While keeping an eye on the situation, Manager McGranahan held the phone in the air so that the dispatcher could hear the intensity and nature of the argument.  *See* Ex. G, McGranahan Declaration; *see also* Ex. H, Police Transcript of Calls, at 000028.  He told the dispatcher that he feared the situation would become violent.  *See* Ex. H, Police Transcript of Calls, at 000029.  The shouting and screaming continued with Plaintiffs and members of the Group yelling obscenities at each other and impugning each other's character.  *See* Ex. H, Police Transcript of Calls, at 000029; *see also* Ex. I, Video of Fight.

### F.  The Brawl:  Plaintiff Jackson Throws a Glass and the Physical Fight With the Group Starts.

As Hooks and the Group continued arguing, Jackson grabbed a glass from the bar, raised the glass over his head, and hit a Group member across the head splattering glass all over the floor. *See* Ex. I, Video of Fight; *see also* Ex. G, McGranahan Declaration; ("And then he touched me and that's when I was just - - I just couldn't take it no more. . . I just turned around and hit him with the - - with the cup."), Ex. F, Jackson Dep. at 56:23-57:5; ("Q:  Right?  But there's no dispute that you took the glass and hit him on the head with it.  Right?  . . .  A:  Yes."), Ex. F, Jackson Dep. at 160:1-5.  The Group member fell to the floor.  *See* Ex. I, Video of Fight; *see also* ("Q: And you knocked him out?  He hit the floor after you hit him, didn't he?  A:  Yes."), Ex. F, Jackson Dep. at 57:16-18.  Jackson's blow with the glass caused the scene to erupt into a brawl with fighting, pushing, shoving, screaming, and the overturning of furniture.  *See* Ex. F, Jackson Dep. at 57:16-18.  Video evidence depicts the Group and Plaintiffs hitting each other.  *See* Ex. I, Video of Fight; *see also* Ex. N, Second Video of the Fight.

### G. SALTGRASS Management and Employees Attempt to Break Up the Melee.

Manager McGranahan's instructions and the team's efforts to end the brawl went ignored. *See* Ex. H, Police Transcript of Calls, at 000029; *see also* Ex. G, McGranahan Declaration ("I told the group that they need to leave the restaurant since no one could get along. . . The group ignored my directive . . . I then made my way to Ms. Hooks and Mr. Jackson at the bar and informed them that they would *also* need to leave . . . Ms. Hooks stated that she and Mr. Jackson were not leaving. I politely asked again that they leave.").

During the fight, SALTGRASS employees diverted attention away from their jobs in order to help deescalate the situation. *See* Ex. H, Police Transcript of Calls, at 000029; *see also* Ex. G, McGranahan Declaration. After almost three minutes of fighting, pushing, and shoving, the SALTGRASS team and customers worked to physically separate Plaintiffs and stop the physical fighting. *See* ("Q: Some workers trying to break it up? A: Uh-huh."), Ex. F, Jackson Dep. at 54:15-16; *see also* ("Q: Now, you've told me about the guy who worked behind the bar and some sort of - - worked at the restaurant. He interceded, right, to try to break it up? The black guy? A: Yeah . . ."), Ex. E, Hooks Dep. at 109:21-25; Ex. G, McGranahan Declaration; Ex. I, Video of Fight; Ex. N, Second Video of Fight. During the fight, Plaintiffs were not socially distanced. *See* ("Q: Everybody was close in contact with each other. Right? A: Yes."), Ex. F, Jackson Dep. at 114:19-22. The fight also disrupted other customers' meals and evening. *See* Ex. I, Video of Fight; *see also* Ex. Ex. N, Second Video of Fight.

### H. During the Altercation, SALTGRASS Employees and Customers Called the Police.

SALTGRASS employees also called 911 to report the fight. *See* Ex. H, Police Transcript of Calls, at 000030; *see also* ("Q: . . . I mean, I'm a server and this is ridiculous. That appears to

be a server calling to get the cops to get down there, right?  A:  Uh-huh.") Ex. E, Hooks Dep. at

117:11-15.  Multiple SALTGRASS customers also called 911 to report the fight.  *See* Ex. H, Police

Transcript of Calls, 000030-34.  Plaintiffs do not dispute that SALTGRASS employees called the

police.  *See* ("If the records show in black and white that they did call the police, you wouldn't be

shocked by that, would you?  No."), Ex. F, Jackson Dep. at 29:15-18.

    **I.**    **Plaintiffs Concede That SALTGRASS Called the Police Because it was the Best Course of Action.**

Plaintiffs admit that a business has several options when dealing with a disturbance,

including asking the people creating the disturbance to leave.  *See* ("Q:  When a customer comes

in your place, you have a couple of options, right?  A:  Uh-huh  Q: . . . You can ask them to leave.

Correct?  A:  Yes . . . Q:  If they get disorderly, you can call the police.  Correct? . . . A:  Yes.  Q:

If customers get into a fight in your business, you don't necessarily have to jump in and fight with

them, do you? . . . A:  No. . . Q:  You want them out?  A:  Yes.  Q:  And you want them out

lawfully.  Right?  A:  Yes."), Ex. F, Jackson Dep. at 98:12-99:11; *see also* ("Q:  Let me ask you,

you don't have to be a restauranteur to know to run people out of your business - - to ask people

to leave when they're upsetting your business.  Right? . . . A:  True.  Q:  You don't have to be a

brilliant businessman to realize when people are upsetting your customers, that you ought to ask

them to leave.  Right? . . . Q:  True . . . Q:  And you understand that it's important in any business,

whether - - no matter who caused the fight or who started the fight, to get the fight out of the

business.  Right?  A:  Right."), Ex. F, Jackson Dep. at 160:16-161:13.  Plaintiffs admit that if a

fight is taking place in their business, and the people fighting will not leave despite repeated

requests, the next option is to call the police.  *See* ("Q:  So you could say, Get out.  And if they

didn't get out, your best bet would be to call the police, right?  A:  That's right."), Ex. E, Hooks

Dep. at 140:7-10; *see also* ("Q:  Call the police, right?  A:  Right.  Q:  And that's what's best for

you and that's what's best for everybody else there, right?  A:  Right."), Ex. E, Hooks Dep. at 149:23-150:2.

Plaintiffs admit that calling the police is the best option to handle a disturbance because it is hard to know the danger the customer may pose, i.e. if they have a weapon.  *See* ("Q:  And you know what to do when people come into your business and act as a fool, right?  . . . A:  Call the police.  . . . Q:  And that's what's best for you and that's what's best for everybody else there, right?  A:  Right.  . . .Q:  Yes.  If you intervene, meaning you, and you don't know what they have in their pocket whether it's a gun or a knife or whatever, you can risk everybody in that restaurant, couldn't you?  A:  I guess.  . . .  Q:  So the best thing is to let the police do their job, isn't it?  A:  I guess."), Ex. E, Hooks Dep. at 149:16-151:13.

### J.  After the Fight, Plaintiff Jackson Deals a Final Blow to a Group Member.

After the parties were separated, Jackson sucker punched a member of the Group, knocking him out.  *See* ("Q:  You knocked him out again, didn't you?  . . . A:  Yes."), Ex. F, Jackson Dep. at 62:1-4.

### K.  Plaintiffs Admit That SALTGRASS Treated Them Well and that the Fight was Between Them and the Group.

SALTGRASS managers and employees did not make any of the alleged comments that Plaintiffs complain were made by the Group.  *See* ("Q:  Okay. And they went  - - 'they' being the people that had been in the altercation with you - - went in the bus?  A:  Uh-huh. Yes."), Ex. E, Hooks Dep. at 59:5-8.

Plaintiffs admit that they were never mistreated by the SALTGRASS staff.  *See* ("Q:  On that day of that incident, you and Ms. Hooks came to the restaurant to eat, didn't you?  A:  Yes. . . . Q:  Y'all had been treated fairly when you were there before?  A:  Yes.  Q:  That's why you came back.  Right?  A:  True.  . . . Q:  On that particular day, y'all came and they served you by sitting

you in an area away from everybody else.  Right?  . . . A:  Yes.  Q:  And you were comfortable where they seated you?  A:  Yes."), Ex. F, Jackson Dep. at 47:20-49:2.  SALTGRASS employees and management were not involved in the altercation and did not contribute to the altercation.  *See* ("Q:  And those other folks that came in and got in this altercation with you, nobody seated them next to you, they simply came in your direction to get in your face, right?  A:  Right."), Ex. E, Hooks Dep. at 155:5-9.   The fight was between Plaintiffs and the group.  *See*  ("Q:  There were folks from Louisiana fighting and then there were you and Ms. Hooks fighting.  Correct?  A:  Yes."), Ex. F, Jackson Dep. at 149:8-10.

Plaintiffs admitted that the fight was between them and the Group, not SALTGRASS managers or employees.  *See also* ("Q:  They're fighting you and you're fighting them back, right?  A:  Right. . . .   Q:  There was nobody involved in this fight that was a restaurant manager or employee, was there?  A:  No."), Ex. E, Hooks Dep., at 120:20-121:1; Ex. H, Police Transcript of Calls.  The SALTGRASS employees and management did not act rudely, neglect them, refuse to serve, or treated them with hostility.  *See* Ex. F, Jackson Dep. at 47:20-49:2.

### L.  Plaintiffs Concede That No One Expected the Incident to Occur.

Plaintiffs admit that there was no way for anyone to know that the Group and Plaintiffs would engage in a physical brawl.  *See* ("Q:  You couldn't have been clairvoyant and pick out what the hell they were going to do, right?  A:  Right."), Ex. E, Hooks Dep. at 134:16-18; ("Q:  You know, we didn't know that it was going to escalate to that.  And nobody else did either is my point?  . . .  A:  Yep."), Ex. E, Hooks Dep. at 135:12-16.

### M. Plaintiffs and Other Customers Left Without Paying for Their Food.

Plaintiffs admitted that they did not pay for their food and that other customers also left without paying due to Plaintiffs' disruptions.  *See* ("Q:  You didn't pay for the glass, you didn't

pay for the salad?  . . .  A:  No."), Ex. E, Hooks Dep. at 138:2-14; *see also* ("Q:  Did you ever pay Saltgrass for the glass that you busted  A:  - - No."), Ex. F, Jackson Dep. at 64:16-18; ("Q:  But you wouldn't be surprised if other people that were eating, they would leave?  A:  . . . I guess."), Ex. F, Jackson Dep. at 67:12-16.   Plaintiffs admitted that customers who leave without paying caused financial loss for the restaurant and ruined the reputation and business relationship that the restaurant has with those customers.  *See* ("Q:  You know fights generally at any location are not good for business.  Right?  A:  True.  Q:  They damage the reputation of the business.  Correct? . . . A:  Depends.  . . . Q:  I mean, the average person doesn't want to come to a restaurant where there are fights breaking out.  Right?  . . . You go to a restaurant to dine and to enjoy your spouse or whomever you're with.  Right?  A:  Yes.  Q:  You want to have a good meal, you want to have a good time, and go home safely.  Right?  A:  Yes.  Q:  And if you have a restaurant where people have been fighting, you're a little hesitant about going in there.  Right?  . . . A:  Yes."), Ex. F, Jackson Dep. at 145:8-146:11.

### N.  After the Incident, Plaintiff Hooks Started a GoFundMe.

After the June 27, 2020 incident, Hooks started a GoFundMe account to pay her attorney's retainer.  *See* ("Q:  So tell me about your GoFundMe account.  How did that come up?  A:  I came about it - - I think I had in my mind that I was going to be paying Mike to retain him."), Ex. E, Hooks Dep. at 95:1-7.   But on the GoFundMe page, Hooks claimed that she was "raising money to fight for justice against a mob of unruly privileged white people."  *See* Ex. C.   Hooks states that she ultimately gave all the money back to the donors.  *See* ("But I gave all the money back to the people that sent me the GoFundMe."), Ex. E, Hooks Dep. at 95:6-7.

### O. Plaintiffs Did Not Get COVID.

Plaintiffs concede that they did not get COVID as a result of the altercation. *See* ("Q: You didn't get Covid as a result of the altercation?  A:  No."), Ex. F, Jackson Dep. at 17-19.

### III.   SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Willmon v. Wal-Mart Stores, Inc.*, 957 F. Supp. 1074, 1076 (E.D. Ark. 1997).  "Summary judgment is appropriate only where there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds." *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.1987).  "The moving party bears the burden of setting forth facts to show that he is entitled to judgment as a matter of law." *Willmon, Inc.*, 957 F. Supp. at 1076.  Once the moving party has carried its burden under Rule 56, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*.  The nonmoving party cannot rest upon general allegations in the complaint. *See id.* "When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law." *Booker v. Dillard's Dep't Stores*, No. 505CV00335 JLH, 2007 WL 1704584, at *1 (E.D. Ark. June 11, 2007).

### IV.   LEGAL ARGUMENT AND ANLYSIS

#### A.  Plaintiffs' Claim That SALTGRASS Violated Ark. Code Ann. § 20-7-109 is Improper.

On September 21, 2021, Plaintiffs filed the instant lawsuit asserting a claim of negligence premised upon SALTGRASS allegedly failing to protect Plaintiffs from the Group, including

alleged verbal insults and actions such as coughing, in response to COVID-19 protocols.  *See*
Compl. at  ¶¶ 29, 49, 51-53.  To succeed on a negligence claim, Plaintiffs must establish:  (1) the
existence of a duty on the part of SALTGRASS to conform to a specific standard of care; (2)
breach of that duty by SALTGRASS; (3) injury to the Plaintiffs actually and proximately caused
by SALTGRASS' breach; and (4) resulting damages.  *See Cross v. Western Waste Ind.*, 2015 Ark.
App. 476, 7 (2015).

### i.        Defendant Did Not Violate Its Duty to Plaintiffs.

In Arkansas, for negligence claims, "the plaintiff must prove that the defendant owed
[Plaintiffs] a duty of care which it violated."  *Willmon*, 957 F. Supp. at 1076.  Arkansas has
traditionally recognized that a business owes a duty to exercise ordinary care to its customers, who
are business invitees.  *See id*.  On the other hand, a business owes "a trespasser and a licensee the
duty to refrain from causing him injury by willful or wanton conduct."  *Ken's Disc. Bldg.
Materials, Inc. v. Meeks*, 95 Ark. App. 37, 40–41 (2006).  "To constitute willful or wanton conduct,
there must be a course of action that shows a deliberate intention to harm or that shows utter
indifference to, or conscious disregard of, the safety of others."  *Id*. at 41.  "A person acts willfully
and wantonly when he knows or should know in the light of surrounding circumstances that his
conduct will naturally and probably result in bodily harm and continues such conduct in reckless
disregard of the consequences."  *Id*.

More particularly, here, generally, drinking establishments owe their patrons a duty "to use
reasonable care and vigilance to protect [them] . . . from reasonably foreseeable injury,
mistreatment or annoyance at the hands of other patrons."  *Industrial Park Businessmen's Club v.
Buck*, 252 Ark. 513, 524, 479 S.W.2d 842, 848 (1972).  A drinking establishment may breach this
duty by failing "to take appropriate action to eject persons of undesirable character from the

premises or knowingly permitting irresponsible, vicious or drunken persons to be in and about the premises or failure to maintain order and sobriety in the establishment." *Id*. "[T]he proprietor is not required to protect the patrons of a bar or tavern from unlikely dangers, or improbable harm, but . . . is required to take affirmative action to maintain order when harm to patrons is reasonably foreseeable, and certainly whenever the circumstances are such as to indicate that the danger of harm to patrons by other patrons should have been anticipated by one reasonably alert." *Id.*

Put differently, although a tavern keeper or bar operator is not an insurer of the safety of his patrons, the owner "is under the duty to use reasonable care and vigilance to protect guests or patrons from reasonably foreseeable injury, mistreatment or annoyance at the hands of other patrons." *Burns v. Boot Scooters, Inc.*, 61 Ark. App. 124, 128 (1998). However, the owner "is not required to protect the patrons of a bar or tavern from unlikely dangers, or improbable harm, but he is required to take affirmative action to maintain order when harm to patrons is reasonably foreseeable, and certainly whenever the circumstances are such as to indicate that the danger of harm to patrons by other patrons should have been anticipated by one reasonably alert." *Id.*

### i. Ark. Code Ann. § 20-7-101 is Retroactive and Precludes Plaintiff's Claim.

On February 2, 2021, in light of the COVID-19 global pandemic and resulting global emergency, the Arkansas legislature proposed amendments to Ark. Code Ann. § 20-7-101. *See* S.B. 254, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). Specifically, the Arkansas legislature proposed the following addition to Ark. Code Ann. § 20-7-101(c) to ensure that the Arkansas State Board of Health does not:

> (2) Require, through enforcement or application, or both, of the provisions of this act or any orders or rules issued in accordance with this act related to the coronavirus 2019 (COVID-19) public health emergency *a firm, person, or corporation to regulate the behavior of patrons or customers of the firm, person, or corporation* <u>*during*</u> *the coronavirus 2019 (COVID-19) public health emergency*.

Ark. Code Ann. § 20-7-109 (emphasis added).

The Arkansas legislature *also* included an additional "Emergency Clause" amendment that detailed the legislative purpose behind the proposed amendments:

> a healthy economy is essential to the public peace, health, and safety of the citizens of this state; that ***during the public health emergency related to coronavirus 2019 (COVID-19), businesses have been unfairly penalized for the behavior of their patrons and customers; that businesses are not at fault for the behavior of their patrons and customers; that the penalization of businesses for the behavior of their patrons and customers prompts closure of businesses in this state and adversely impacts the state's economy; that businesses deserve protections from this unfair penalization for the behavior of their patrons and customers; and that this act is immediately necessary to protect businesses from unfair penalization for the behavior of their patrons and customers and to preserve the public peace, health, and safety by maintaining the state's economy.***

S.B. 254, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) (emphasis added).

On March 17, 2021, the Arkansas Assembly passed the February 2, 2021 bill to amend Ark. Code Ann. § 20-7-109 to include section (c)(2). *See* S.B. 254, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). On March 18, 2021, the Arkansas Senate also passed section (c)(2) to protect businesses, like SALTGRASS, from liability for the behavior of their patrons and customers, including Plaintiffs and the Group during the COVID-19 pandemic. *See id.*

This lawsuit, or "penalization," is the exact type of action that Arkansas Code § 20-7-101 intended to address. *See* Ark. Code Ann. § 20-7-101. The Arkansas legislature was clear: businesses have been unfairly penalized for the behavior of patrons and customers, businesses are not at fault for the behavior of their patrons and customers, and penalization of businesses for the behavior of patrons and customers adversely impacts the state economy. *See id.*

Although passed after the incident at issue here, a statute may have retroactive effect if the legislation is remedial. *See Bean v. Off. of Child Support Enf't*, 340 Ark. 286, 297 (2000). Statutes which are remedial or procedural generally supply new, different, or more appropriate remedies

which relate to existing rights, and do not create new rights or extinguish old ones.  *See Gannett River States Pub. Co. v. Arkansas Indus. Dev. Comm'n*, 303 Ark. 684, 689 (1990); *see also Dos Santos, S.A. v. Beebe*, 418 F. Supp. 2d 1064, 1078 (W.D. Ark. 2006) ("Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary.").

Here, the Arkansas legislature explicitly stated that they amended the Ark. Code Ann. § 20-7-109 to protect businesses during the COVID-19 public health emergency.  *See* S.B. 254, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021).  The Arkansas legislature's purpose was clear.  *See id.*  The Arkansas legislature added section (c)(2) as a remedial measure "to preserve the public peace, health, and safety by maintaining the state's economy" "during the public health emergency related to coronavirus 2019 (COVID-19)."  *Id.*  It is therefore undeniable that the 2021 Ark. Code Ann. § 20-7-109 amendment is retroactive.  *See id.*

Accordingly, pursuant to Ark. Code Ann. § 20-7-101(c)(2), SALTGRASS cannot be held liable for the actions of its patrons or customers, including those of Plaintiffs or the Group during the COVID-19 pandemic.  No duty was owed to the Plaintiffs.

Moreover, at the time of the incident, Executive Order 20-33 ("EO 20-33") which was in effect and states:

> To protect businesses that open or remain open during the COVID-19 emergency, all persons in the State of Arkansas and the person's employees, agents, and officers *shall be immune from civil liability for damages or injuries caused by or resulting from exposure of an individual to COVID-19 on the premises owned or operated by those persons or during any activity managed by those persons*.
>
> The immunity provided under this Executive Order does not apply to willful, reckless, or intentional misconduct resulting in injury or damages.  *It is presumed that a person and person's employees, agents, and officers are not committing willful, reckless, or intentional misconduct under this order if the person and the*

*person's agents, and officers are (a) substantially complying with health and safety directives or guidelines issued by the Governor or the Secretary of the Department of Health; or (b) acting in good faith while attempting to comply with health and safety directives or guidelines issued by the Governor or the Secretary of the Department of Health.*

(emphasis added).

EO 20-33 grants SALTGRASS immunity from damages or injuries caused by or resulting from "exposure of an individual to COVID-19," with certain exceptions. *Id*. However, Plaintiffs do not claim damages or injuries caused by or resulting from an exposure to COVID-19 because neither Plaintiff became infected with COVID-19 after the incident. *See* ("Q:  You didn't get Covid as a result of the altercation?  A:  No."), Ex. F, Jackson Dep. at 17-19.

Finally, under Arkansas Code Annotated § 20-7-101(a)(5), "[e]nforcement of orders, rules, or directives is the expressed responsibility of the issuing agency," and not Plaintiffs.  A business that violates the statute or "any of the rules issued or promulgated by the State Board of Health . . . may be assessed a civil penalty by the board," not the Plaintiffs.  Ark. Code Ann. § 20-7-101(b)(1)(A)(i).  Plaintiffs lack standing to sue SALTGRASS for any alleged negligence related to COVID-19 protocol violations.  *See* Ark. Code Ann. § 20-7-101(a)(5), (b)(1)(A)(i).

### ii.  SALTGRASS Did Not Fail to Abide by Arkansas' Governor's Executive Order 20-33 Mandating COVID-19 Protocols.

Even if the Plaintiffs claim was properly before this Court, and SALTGRASS owed any duty to the Plaintiffs as alleged, SALTGRASS complied with the applicable COVID-19 protocols. Plaintiffs contend that SALTGRASS failed to enforce Arkansas' COVID-19 protocols and requirements for dining establishments. *See* Compl. at ¶ 73(a).

It is undisputed that when Plaintiffs arrived at the Restaurant, SALTGRASS socially distanced them from the other patrons.  *See* Ex. G, McGranahan Declaration; *see also* ("Q:  He asked you about social distancing.  It's no dispute here that when you came into the restaurant they

asked you to sit at the far end of the bar for social distancing reasons, right?  A:  Yes."), Ex. E, Hooks Dep. at 154:12-16.  It is also undisputed that when Hooks informed Manager McGranahan that a member of the Group coughed on her and that Plaintiffs were uncomfortable with the Group, Manager McGranahan immediately looked for the man and aided in finding tables in the Restaurant for the Group to move them away from Plaintiffs.  *See* Ex. G, McGranahan Declaration. It is undisputed that two SALTGRASS employees called the police and asked the police to come to the restaurant and restore order.  *See* Ex. H, Police Transcript of Calls, 000028-30; *see also* ("If the records show in black and white that they did call the police, you wouldn't be shocked by that, would you?  No."),  Ex. F, Jackson Dep. at 29:15-18.  It is undisputed that from the first incident of the man from the Group attempting to sit near the Plaintiffs to the physical altercation, SALTGRASS management and employees followed COVID protocols and attempted to separate the parties and deescalate any situation.  *See* ("Q:  Some workers trying to break it up?  A:  Uh-huh."), Ex. F, Jackson Dep. at 54:15-16; *see also* ("Q:  Now, you've told me about the guy who worked behind the bar and some sort of - - worked at the restaurant.  He interceded, right, to try to break it up?  The black guy?  A:  Yeah . . ."), Ex. E, Hooks Dep. at 109:21-25; Ex. G, McGranahan Declaration; Ex. I, Video of Fight;  Ex. N, Second Video of Fight.

In fact, as the verbal argument continued, Manager McGranahan told members of the Group that they needed to leave the Restaurant.  *See* Ex. G, McGranahan Declaration.  Manager McGranahan also specifically requested that Plaintiffs leave.  *See* ("Q:  And they - - did someone ask you to leave the restaurant?  A:  I can't really remember.  I don't think they did but might have."), Ex. F, Jackson Dep. at 63:25-64:3; *see also* Ex. G, McGranahan Declaration.  Plaintiffs refused.  *See also* Ex. G, McGranahan Declaration.

Moreover, the circumstances of this case establish that the physical altercation was not foreseeable.  An owner "is under the duty to use reasonable care and vigilance to protect guests or patrons from reasonably foreseeable injury, mistreatment or annoyance at the hands of other patrons." *Burns*, 61 Ark. App. at 128 (finding breach of duty where the security personnel of the business exacerbated the disturbance and harmed the plaintiff in the process).  However, the owner is only required to protect the patrons from foreseeable harm.  *See id.*  Ms. Hooks testified at her deposition that, at the time a member of the third group allegedly coughed on her, neither Plaintiffs nor SALTGRASS knew that the first, second, and third groups were affiliated.  *See* Ex. E, Hooks Dep. at 132:15-22.  Nobody, including SALTGRASS, could have known the man from the third group was going to cough on her or that the situation would escalate.  *See* Ex. E, Hooks Dep. at 134:7-24, 135:12-22.  Plaintiffs admit that there was no way for anyone to know that the Group and Plaintiffs would engage in a physical brawl.  *See* ("You couldn't have been clairvoyant and pick out what the hell they were going to do, right?  Right."), Ex. F, Jackson Dep. at 134:16-18; ("You know, we didn't know that it was going to escalate to that.  And nobody else did either is my point? . . . Yep."), Ex. F, Jackson Dep. at 135:12-16.  The entire interaction between Plaintiffs and the other group, including the Altercation, "was about three minutes.  So [SALTGRASS's managers] couldn't have really had any time to come and say anything to us."  Ex. E, Hooks Dep. at 47:17-48:11.  Video evidence supports Ms. Hook's deposition testimony.  *See* Ex. I, Video of Fight.  Accordingly, Plaintiffs have no evidence that SALTGRASS breached their duty of care, and Plaintiffs' negligence claim fails.

### iii.    Defendant Did Not Cause Plaintiffs' Injuries.

As to the third element of a prima facie negligence claim, proximate cause is that cause which, "in a natural and continuous sequence, produces damage." *Sluder v. Steak & Ale of Little*

*Rock, Inc.*, 361 Ark. 267, 275 (2005).  "When asserting the existence of an intervening cause, the defendant has the burden of proving that, following any act or omission on its part, an event intervened that in itself caused damage completely independent of the defendant's conduct." *Villines v. North Arkansas Regional Medical Center*, 2011 Ark. App. 506, 8 (2011).  "The intervening cause must be such that the injury would not have been suffered except for the act, conduct or effect of the intervening agent totally independent of the acts or omission constituting the primary negligence." *Barnett v. Cleghorn*, 2017 Ark. App. 641, 6 (2017).

Assuming *arguendo* that SALTGRASS breached a duty owed to Plaintiffs (which it did not), the breach did not proximately cause Plaintiffs' injuries.  The June 27, 2020 altercation was not the result of negligence by SALTGRASS.  *See* ("Q:  Okay. And they went  - - 'they' being the people that had been in the altercation with you - - went in the bus?  A:  Uh-huh.  Yes."), Ex. E, Hooks Dep. at 59:5-8; *see also* ("Q:  On that day of that incident, you and Ms. Hooks came to the restaurant to eat, didn't you?  A:  Yes.  . . . Q:  Y'all had been treated fairly when you were there before?  A:  Yes.  Q:  That's why you came back.  Right?  A:  True.  . . . Q:  On that particular day, y'all came and they served you by sitting you in an area away from everybody else.  Right?  . . . A:  Yes.  Q:  And you were comfortable where they seated you?  A:  Yes."), Ex. F, Jackson Dep. at 47:20-49:2.  SALTGRASS employees and management were not involved in the altercation and did not contribute to the altercation.  *See* ("Q:  And those other folks that came in and got in this altercation with you, nobody seated them next to you, they simply came in your direction to get in your face, right?  A:  Right."), Ex. E, Hooks Dep. at 155:5-9.  The SALTGRASS employees and management did not act rudely, neglect them, refuse to serve, or treat them with hostility.  *See* Ex. F, Jackson Dep. at 47:20-49:2.  And as established above, the Restaurant was COVID compliant.

It was the Plaintiffs' own actions that constitute intervening causes that foreclose SALTGRASS's liability.  Plaintiff's ignored Mr. McGranahan's attempts to de-escalate the verbal confrontation.  *See* Ex. G, McGranahan Declaration; *see also* Ex. H, Police Transcript of Calls, at 000029 ("It's a female.  The male's not doing anything. . . they're yelling at the patrons.  They're yelling at the manager.").  Plaintiffs ignored Mr. McGranahan's requests to vacate the premises. *See* Ex. G, McGranahan Declaration.  Plaintiff Jackson initiated the physical fight by throwing the margarita glass.  *See* Ex. I, Video of Fight; *see also* Ex. G, McGranahan Declaration; ("And then he touched me and that's when I was just - - I just couldn't take it no more. . . I just turned around and hit him with the - - with the cup."), Ex. F, Jackson Dep. at 56:23-57:5; ("Q:  Right?  But there's no dispute that you took the glass and hit him on the head with it. Right?  . . .  A:  Yes."), Ex. F, Jackson Dep. at 160:1-5.  Plaintiffs could have avoided the harm they claim to have suffered if they obeyed Mr. McGranahan's attempts to de-escalate the verbal confrontation, obeyed Mr. McGranahan's request that Plaintiffs leave SALTGRASS, and did not initiate the incident in the first instance.  Accordingly, Plaintiffs have no evidence that SALTGRASS caused their injuries, and Plaintiffs' negligence claim fails.

### iv.      Plaintiffs Have Not Established Damages.

Finally, as to the final element of a prima facie negligence claim, Plaintiffs must establish resulting damages.  *See Cross*, 2015 Ark. App. at 7.  Here, however, Jackson admits that he was not physically harmed during the altercation and admits that lingering pain in his hand was "probably" because he hit somebody, and his shoulder had "a little ache in it."  Ex. F, Jackson Dep. at 69:5-9, 153:11-22.  To date, Jackson has not produced evidence to support his claims for emotional damages.  *See* Ex. F, Jackson Dep. at 154:9-12.  Even if Jackson's emotional harm was proven, "mental suffering alone, unaccompanied by physical injury, cannot be made the subject of

an action for damages." *Pennebaker v. Furry Feet Retreat, Inc.*, 2021 Ark. App. 138, 3 (2021). Moreover, Jackson cannot state a claim for lost wages or earnings because he did not lose time at work or income because of the incident. *See* Ex. F, Jackson Dep. at 69:25-70:4.

Hooks alleges that she was punched in the face during the incident, but, to date, she has not produced medical records for the treatment she received for her black eye. *See* Compl. at ¶ 56; *see also* Ex. E, Hooks Dep. at 69:15-17. "A party seeking medical damages has the burden of proving the reasonableness and necessity for that party's medical expenses." *Avery v. Ward*, 326 Ark. 829, 833 (1996). Hooks has not met her burden with regard to any alleged injury by a punch to her face.

Hooks also claims that she received treatment for her neck and shoulder pain after the fight. *See* Ex. J, Hooks' Response to Interrogatory No. 14. Hooks testified at her deposition, however, that she received treatment for this pain because she suffered from degenerative arthritis. *See* Ex. E, Hooks Dep. at 66:2-75:14. To date, she has not disclosed a medical expert or produced medical records to support this diagnosis either. *See* Ex. E, Hooks Dep. at 69:15-17. Hooks also claims emotional harm because the fight shook her up and she was embarrassed when the video of the incident was made public. *See* Ex. E, Hooks Dep. at 105:15-109:20. Mental anguish, however, "must result directly from, or be the natural, legitimate, and proximate consequence of the physical injury forming the basis of the action." *Chicago, R.I. & P. Ry. Co. v. Caple*, 207 Ark. 52 (1944); *see also FMC Corp., Inc. v. Helton*, 360 Ark. 465, 483 (2005) ("Even if this court were to accept Appellees' argument that 'actual damages' include damages for mental anguish, such a ruling would not obviate the requirement that Appellees prove that they suffered a physical injury that led to the mental anguish."). Hooks has not established that her alleged emotional damage relates to her physical injury from the Altercation.

Regardless neither Plaintiffs' injuries were the proximately caused by SALTGRASS' alleged negligence and were direct results of Plaintiffs' own refusal to leave the Restaurant and fight with the Group.  Neither Plaintiffs have proven damages from the incident, and accordingly, Plaintiff's negligence claim fails.

### B.  Defendant is Entitled to Judgment as a Matter of Law on Plaintiffs' Claim for Racial Discrimination Under Section 1981.

Section 1981 protects the right of individuals like the Plaintiffs to the same benefits and privileges of contractual relationships as the other patrons.  *See  id.* (finding that evidence of bad manners, isolated rudeness, and neglect were insufficient for a Section 1981 claim, but evidence of a series of actions, including explicit refusal to serve, discouraging a coworker from assisting, and treating the customers with hostility supported a Section 1981 claim).  To succeed on a claim of race discrimination under Section 1981, plaintiffs must establish "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant."  *Gregory v. Dillard's, Inc*., 565 F.3d 464, 469 (8th Cir. 2009) (citing *Green v. Dillard's*, Inc., 483 F.3d 533, 538 (8th Cir. 2007)).  Here, there is no dispute that Plaintiffs, African American individuals, are members of a protected class.  *See Green*, 483 F.3d at 538.

To prevail on their Section 1981 claim, the Plaintiffs must also show actionable interference with a contractual interest.  *See id.* at 539.  Here, Plaintiffs claim that they were not allowed to choose their seats while the Caucasian patrons could.  *See* Compl. at ¶ 80.  However, the alleged act of allowing "white patrons" to freely choose their seats did not "block" Plaintiffs' creation of a contractual relationship.  *See infra*.  Indeed, Plaintiffs testified at their depositions that they were seated and had placed their orders *before* the "white patrons" were seated.  Ex. E, Hooks Dep. at 52:17-22, 135:8-9); *see also* Ex. F, Jackson Dep. at 65:6-18.  Plaintiffs might not

have received the remainder of their order because of the fight, but that fact does not amount to interference under § 1981. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471 (8th Cir. 2009).

Additionally, there is simply no evidence that any SALTGRASS employee refused to allow Plaintiffs to choose their seats as Plaintiffs claim. *See* Compl. at ¶ 80; *see also* ("Q:  On that day of that incident, you and Ms. Hooks came to the restaurant to eat, didn't you?  A:  Yes. . . . Q: Y'all had been treated fairly when you were there before?  A:  Yes.  Q:  That's why you came back. Right?  A:  True. . . . Q:  On that particular day, y'all came and they served you by sitting you in an area away from everybody else.  Right?  . . . A:  Yes.  Q:  And you were comfortable where they seated you?  A:  Yes."), Ex. F, Jackson Dep. at 47:20-49:2.  It is undisputed that Plaintiffs were seated at the bar in an area that was COVID compliant.  *See* ("Q:  And she did that because they wanted you to social distance?  A:  Yes.  Q:  And they instructed you to social distance?  A:  Yes."), Ex. E, Hooks Dep. at 27:10-14.  The undisputed evidence further establishes that Plaintiffs were preferred customers who frequently ate at the SALTGRASS Restaurant.  *See* (". . . we patronize that restaurant several, several times. ."), Ex. E, Hooks Dep. at 107:8-9. Plaintiffs were never mistreated by the SALTGRASS staff.  *See* ("Q:  On that day of that incident, you and Ms. Hooks came to the restaurant to eat, didn't you?  A:  Yes. . . . Q:  Y'all had been treated fairly when you were there before?  A:  Yes.  Q:  That's why you came back. Right?  A: True. . . . Q:  On that particular day, y'all came and they served you by sitting you in an area away from everybody else.  Right?  . . . A:  Yes. Q:  And you were comfortable where they seated you? A:  Yes."), Ex. F, Jackson Dep. at 47:20-49:2.  The SALTGRASS employees and management did not act rudely, neglect them, refuse to serve, or treat them with hostility.  *See* Ex. F, Jackson Dep. at 47:20-49:2.

Moreover, Plaintiffs produce no evidence to prove discriminatory intent by SALTGRASS. *See Green*, 483 F.3d at 540 (finding that discriminatory employees with hostile propensities and a disciplinary history related to racist behavior could hold the employer liable for negligence).  There is no evidence of discriminatory policies or discriminatory acts by SALTGRASS.  *See* Ex. F, Jackson Dep. at 47:20-49:2.  SALTGRASS' managers and employees did not make any of the allegedly racially derogatory comments that Plaintiffs complain were made by the Group.  *See* (". . . And they just stood around behind us and was just talking about COVID and how stupid people were about COVID. . ."), Ex. E, Hooks Dep. at 30:11-25; *see also* (" . . . he said across the room, You fucking black bitch, across the room."), Ex. E, Hooks Dep. at 41:12-17; ("Q:  These individuals called you the N-word?  A:  Uh-huh."), Ex. E, Hooks Dep. at 111:12-14; ("Q:  When you came out of the restroom, he called you a black bitch?  A:  No, not him, the Willis guy."), Ex. E, Hooks Dep. at 156:24-157:1; ("Q:  . . . who made the first reference that can be attributed to race that you recall?  A: . . . Mr. Willis."), Ex. E, Hooks Dep. at 147:24-4.

Finally, there is no evidence that any inaction by SALTGRASS contributed to the incident. *See* ("Q:  And those other folks that came in and got in this altercation with you, nobody seated them next to you, they simply came in your direction to get in your face, right?  A:  Right."), Ex. E, Hooks Dep. at 155:5-9.  Here, when Plaintiff Hooks informed Manager McGranahan of the coughing incident, Manager McGranahan immediately looked for the man and attempted to find tables in the Restaurant for the Group to move them away from the bar and away from Plaintiffs. *See* Ex. G, McGranahan Declaration.  When Plaintiffs and the Group became engaged in a verbal altercation, Manager McGranahan requested *both* parties leave the restaurant.  *See* Ex. G, McGranahan Declaration.  SALTGRASS employees and management made every attempt to deescalate each situation and ensure the safety of SALTGRASS customers.  *See* Ex. G,

27

McGranahan Declaration.  There is no dispute that SALTGRASS employees attempted to break up the altercation.  *See* Ex. G, McGranahan Declaration; *see also* ("Q:  Some workers trying to break it up?   A:   Uh-huh."), Ex. F, Jackson Dep. at 54:15-16.   It is undisputed that two SALTGRASS employees even called the police to get all parties involved in the altercation out of the restaurant.  *See* Ex. H, Police Transcript of Calls, 000030; *see also* ("Q:  . . . I mean, I'm a server and this is ridiculous.  That appears to be a server calling to get the cops to get down there, right?  A:  Uh-huh."), Ex. E, Hooks Dep. at 117:11-15.  Accordingly, Plaintiffs have no evidence that SALTGRASS or its employees demonstrated any discriminatory intent towards Plaintiff, and Plaintiffs' Section 1981 race discrimination claim fails.

### C. Defendant is Entitled to Summary Judgment on Defendant's Counterclaims.

#### i. As a Matter of Law, Plaintiffs Are Considered Trespassers.

A person who enters premises open to the public becomes a trespasser when she defies the owner's request to leave.  *See  Moore v. Gibson*, No. 4:20-CV-00258-KGB, 2022 WL 990328, at *10 (E.D. Ark. Mar. 31, 2022); *see also* Restatement (Second) of Torts, § 158, cmt. I.  When an invitee crosses the boundaries of the invitation, he ceases to be an invitee and becomes either a licensee or a trespasser.  *Delgado v. Weyerhaeuser Co.*, No. 1:19-CV-1039, 2021 WL 9349832, at *2 (W.D. Ark. July 29, 2021) (plaintiff was not considered a trespasser because there was no evidence that he was asked to leave immediately).

Here, while Plaintiffs and the Group were verbally arguing, Manager McGranahan repeatedly requested Plaintiffs and the Group leave the restaurant.  *See* Ex. G, McGranahan Declaration.  When Manager McGranahan did so, and Plaintiffs refused to leave, Plaintiffs' and the Groups' status changed from invitee to trespasser.  *See  Delgado*, 2021 WL 9349832, at *2.

Accordingly, Plaintiffs are liable for trespass because they were asked to leave, refused to do so, and caused damage to SALTGRASS.

> ### ii.   As a Matter of Law, Plaintiffs Are Liable for Tortious Interference with Business Relationship.

A plaintiff may assert a claim of tortious interference with a business relationship by establishing (1) the existence of a business expectancy, (2) knowledge of the expectancy on the part of the interferor, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *See W.E. Long Co. v. Holsum Baking Co.*, 820 S.W.2d 440, 443 (Ark. 1991) (citing *Mid-South Beverages, Inc. v. Forrest City Grocery Co.*, 778 S.W.2d 218 (Ark. 1989)). Tortious interference with business expectancy is an intentional tort, which the Eighth Circuit has made clear "is similar to other intentional torts 'in the sense that the defendant must have either desired to bring about the harm to the plaintiff *or have known that this result was substantially certain to be produced by his conduct*.'"  *City Nat'l Bank v. Unique Structures. Inc.*, 929 F.2d 1308, 1316 (8th Cir. 1991) (emphasis added) (applying Arkansas law and quoting Restatement (Second) of Torts, Ch. 37 at 5 (1977)).

Arkansas courts are guided by the Restatement (Second) of Torts, which provides that intentional interference includes interferences with any relations leading to potentially profitable contracts and relationships not amounting to a formal contract.  *See Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 543 (2005); *see also* 45 AM. Jur. 2d Interference § 50 ("One is liable for commission of tortious interference with a business expectancy who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another."); *see also Baptist Health v. Murphy*, 2010 Ark. 358, 17 (2010)

("any prospective business relationship that would be of pecuniary value constitutes a valid business expectancy.").

Plaintiffs admitted that it is common sense that if people are disturbing the business, the restaurant would ask those people to leave. *See* ("Q:  Let me ask you, you don't have to be a restauranteur to know to run people out of your business - - to ask people to leave when they're upsetting your business.  Right? . . . A: True."), Ex. F, Jackson Dep. at 160:16-21; *see also* (" . . . I would put them out, the aggressors. . ."), Ex. E, Hooks Dep. at 139:3-20.  SALTGRASS asked Plaintiffs to leave, but they refused.  *See* Ex. G, McGranahan Declaration.  Moreover, it is undisputed that Plaintiffs did not pay for their food and other customers also left without paying due to Plaintiffs' disruptions.  *See* ("Q:  You didn't pay for the glass, you didn't pay for the salad? . . . A:  No."), Ex. E, Hooks Dep. at 138:2-14; *see also* ("Q:  Did you ever pay Saltgrass for the glass that you busted  A:  - - No."), Ex. F, Jackson Dep. at 64:16-18; ("Q:  But you wouldn't be surprised if other people that were eating, they would leave?  A:  . . . I guess."), Ex. F, Jackson Dep. at 67:12-16.  Each customer, including Plaintiffs and the Group, had business relationships with SALTGRASS on June 17, 2020.  Plaintiffs understood that relationship.  *See* Ex. F, Jackson Dep. at 68:5-10.  Finally, Plaintiffs admit that customers who leave without paying caused financial loss for the restaurant and ruined the reputation and business relationship that the restaurant has with those customers.  *See* Ex. F, Jackson Dep., at 145:8-146:11.

Accordingly, Plaintiffs are liable for tortious interference with business relationships because Plaintiffs knowingly interfered with SALTGRASS' business by refusing orders to leave, starting a physical fight in the restaurant, and causing customers to flee.

IV.     **CONCLUSION**

For the foregoing reasons, Defendant SALTGRASS requests the Court grant Defendant's

Motion for Summary Judgment as to Plaintiffs' Claims and Defendant's Counterclaims.

Respectfully submitted this 10th day of October, 2023.

> Thomas H. Wyatt
> Arkansas Bar No. 2013273
> S. Katie Calvert
> Arkansas Bar No. 2019117
> QUATTLEBAUM, GROOMS & TULL
> PLLC
> 111 Center Street, Suite 1900
> Little Rock, Arkansas 72201
> Telephone:  (501) 379-1700
> Facsimile:  (501) 379-1701
> twyatt@qgtlaw.com
> kcalvert@qgtlaw.com
>
> *and*
>
> David Long-Daniels
> Georgia Bar No. 141916
> M. Allyson Lumpkin
> Georgia Bar No. 640757
> **SQUIRE PATTON BOGGS (US) LLP**
> 1201 West Peachtree Street NW, Suite 3150
> Atlanta, GA 30309
> Tel. (678) 272-3200
> Fax. (678) 272-3211
> David.long-daniels@squirepb.com
> Allyson.lumpkin@squirepb.com
>
> By: S. Katie Calvert_____
>      S. Katie Calvert
>
> *Counsel for SALTGRASS Arkansas, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of October, 2023, I served a true and correct copy of the foregoing, *via* the Court's electronic filing system, to all counsel of record. Exhibits I and N, which are video files, were sent by electronic mail to the following:

Michael J. Laux
Laux Law Group
400 W. Capitol Ave., Suite 1700
Little Rock, Arkansas 72201
Telephone: (501) 242-0750
Fax: (501) 372-3482
mlaux@lauxlawgroup.com

*/s/* S. Katie Calvert

S. Katie Calvert